UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEBORAH WEBER,

                              Plaintiff,          **FIRST AMENDED COMPLAINT**

      vs.                                         Case No.: 1-20-cv-00324-CCR

QUEST DIAGNOSTICS OF PENNSYLVANIA INC.;
BUFFALO BEACON CORPORATION
(a/k/a "THE BEACON CENTER");
and NATHANIEL C. WEBSTER, M.D.,

                              Defendants.
_____

         Plaintiff, Deborah Weber, by her attorneys, as and for her First Amended Complaint in the

above matter states as follows:

## PARTIES

1.  Plaintiff is a resident of the City of Buffalo, County of Erie, State of New York.

2.  Upon information and belief, defendant Quest Diagnostics of Pennsylvania Inc., ("Quest")

    is a foreign corporation authorized and existing under the laws of Pennsylvania and is

    authorized to do business and is doing business in the State of New York.

3.  Upon information and belief, defendant Buffalo Beacon Corporation ("Beacon") is a for-

    profit corporation organized and existing under the law of New York State and is doing

    business as The Beacon Center with offices located at 3354 Sheridan Drive, Amherst, New

    York and 295 Main Street, Suite 105, Buffalo, New York and holds itself out to the public

    as an outpatient alcoholism and substance abuse treatment facility.

4. Defendant Nathaniel C. Webster, M.D. ("Webster") is a medical doctor, Medical Director of the Beacon Center and, upon information and belief, a resident of Erie County, New York.

## JURY TRIAL DEMANDED

5. Plaintiff demands a jury trial of all issues triable by a jury.

## GENERAL FACTUAL ALLEGATIONS

6. From 2012 to 2016, plaintiff suffered a series of tragedies in her personal life that caused depression and led to an alcohol abuse. These conditions led to her being arrested and charged with misdemeanor driving while intoxicated on April 14 and April 26, 2016. Prior to April of 2016, plaintiff had never been charged with or convicted of any offenses relating to substance abuse or driving while intoxicated.

7. Plaintiff was able to resolve one of the misdemeanors via plea agreement.

8. On or about May 16, 2017, Plaintiff chose to enter the Clarence Town Drug Court program which offered the opportunity, if the program was successfully completed, to have the other DWI charge dismissed. The terms and requirements of the Drug Court program were that plaintiff would enter drug treatment by completing a rehabilitation program certified by the New York State Office of Alcohol and Substance Abuse Services (OASAS), submit to random alcohol and drug testing, and attend Drug Court every Tuesday evening for two hours for a period of one year. If plaintiff was unable to successfully meet these requirements, she would admit guilt to her DWI misdemeanor charge and be sentenced.

9. On May 26, 2017 plaintiff was evaluated for treatment at defendant Beacon and following its recommendation entered a rehabilitation program at defendant Beacon. She began counseling and random drug and alcohol testing beginning on June 2, 2017. The random

testing protocol was selected by and coordinated through defendant Beacon and performed by defendant Quest. Plaintiff's rehabilitation care was supervised by defendant Webster, defendant Beacon's medical director, who, upon information and belief, approved the testing protocol and was responsible for reviewing all test results. Plaintiff's health insurance company paid defendant Beacon for these services.

10. Prior to plaintiff's assessment by defendant Beacon, plaintiff had voluntarily submitted to testing four times per day through Soberlink and had established she was alcohol free for a period of six months. As a result, defendant Beacon recommended outpatient treatments for a period of three months instead of the six months normally recommended. Plaintiff's treatment at defendant Beacon consisted of periodic and random urine testing, bi-weekly group counseling and weekly individual counseling sessions.

11. From June 2017 through mid-August of 2017 plaintiff was regularly tested using a "pain management clinical screen" selected by defendant Beacon as well as a separate alcohol screening test. This "pain management clinical screen" tested for ten classes of medication or 39 drugs in total. During this period none of these 39 drugs or alcohol were detected in any of plaintiff's urine samples collected through Defendant Beacon and tested by Defendant Quest.

12. Upon information and belief, defendant Quest represented to defendant Beacon that Test Code 20776 was appropriate for forensic testing purposes and included an automatic confirmation of every drug tested at an additional charge.

13. Upon information and belief, defendant Quest contracted with defendant Beacon to perform Test Code 20776 on plaintiff's urine samples.

14. Defendant Quest defines Test Code 20776 to be "Pain Management Drug Screen Profile with Confirmation, Urine."

15. Defendant Quest further defines Test Code 20776 to include CPT Codes 80301, 80335, 80339, 80355, 08359, 80360, 80362, 80366, 80368, 08369, 80373, 82570, 83986, and 84311.

16. Defendant Quest has publicly stated the methodology for Test Code 20776 is "GC/MS, EMIT." This refers to gas chromatography/mass spectrometry, a method of identifying particular molecules based both on their molecular weight and the molecular weight of ions created when energy is applied to the sample.

17. Defendant Quest also stated publicly on its website that "all screening results" under Test Code 20776 "are confirmed automatically at an additional charge."

18. On August 15, 2017, plaintiff provided a urine sample to defendant Beacon during one of her bi-weekly group counseling sessions which was forwarded to defendant Quest for testing under Test Code 20776.

19. The following day, August 16, 2017, plaintiff was required to provide another urine sample to defendant Beacon at one of her weekly individual counseling sessions which was forwarded to defendant Quest for testing under Test Code 20776.

20. The next day, August 17, 2017 plaintiff was again required to provide a urine sample for the third straight day of during her second bi-weekly group counseling sessions, which was forwarded to defendant Quest for testing under Test Code 20776.

21. Plaintiffs urine samples taken on August 15 and 17, 2017, which were forwarded to defendant Quest for testing under Test Code 20776, were reported to defendant Beacon by defendant Quest as negative for all substances tested, including gabapentin.

22. Plaintiff's urine sample taken on August 16, 2017 was reported back to defendant Beacon by defendant Quest as negative for all substances tested under Test Code 20776, except that a minute amount of the drug gabapentin was purportedly present in the sample.

23. Plaintiff's urine sample testing results from her three consecutive days of testing showing complete negative results on August 15, 2017, a minute amount of gabapentin on August 16, 2017, and complete negative results on August 17, 2017, were reviewed and signed by Defendant Webster without any evaluation of or discussion with plaintiff.

24. Plaintiff never ingested the drug gabapentin.   Prior to being informed that her urine sample of August 16, 2017 showed traces of this drug, plaintiff had never even heard of this drug, which is an anticonvulsant medication used to treat epilepsy and also utilized as treatment for chronic nerve pain.

25. Upon information and belief, defendant Quest reported the alleged positive gabapentin test result from the sample from August 16, 2017 to defendant Webster and defendant Beacon, whose employee Carolyn Grisko then reported to the Town of Clarence Drug Court judge that the result of the positive drug test for gabapentin was "confirmed", meaning that this was not a mere screening result but a confirmation test had been conducted by Quest to confirm the presence of gabapentin in plaintiff's August 16, 2017 urine sample by GC/MS testing.

26. Upon information and belief, defendant Beacon, through its employee Carolyn Grisko, also informed the court that there were no known substances that cause false positive results for gabapentin and that the positive test was reliable.

27. Defendant Quest did not in fact conduct confirmation GC/MS testing for gabapentin or any other drug on this urine sample.

28. Plaintiff's urine did not contain gabapentin. Rather, the screening test conducted by defendant Quest found a minute amount of a substance with the same molecular weight as the drug gabapentin, but no confirmation testing was conducted to determine that this substance was indeed gabapentin as opposed to one of thousands of other molecules that have the same molecular weight.

29. The acquired spectrum for plaintiff's August 16, 2017 urine sample conducted by defendant Quest did not match defendant Quest's library spectrum for gabapentin.

30. The half-life of gabapentin in the human body is 5-7 hours, meaning it takes that long for the body to clear 50% of the drug from the body and excrete it in urine.

31. The amount of gabapentin allegedly found through defendant Quest's testing was less than 3% of the concentration found in the urine of people taking gabapentin at prescribed and therapeutic levels.

32. It would be impossible for plaintiff to have ingested gabapentin at any therapeutic level and test positive on only the middle day of three consecutive days of testing because of the drug's half-life.

33. Defendant Webster did not meet with plaintiff to discuss the "positive" drug test for gabapentin to obtain the complete clinical picture, find out if she intentionally or accidentally ingested this drug, or evaluate whether it was scientifically plausible for her to have tested positive for gabapentin on August 16 and test negative for this drug on August 15 and August 17. In fact, defendant Webster never met once with plaintiff during the entire time she was being treated by defendant Beacon.

34. As a result of defendant Beacon, through its employee Carolyn Grisko, informing the Drug Court judge that plaintiff's August 16, 2017 urine sample was confirmed as positive for

gabapentin, plaintiff was publicly humiliated in open court by the judge and her candor was called into question when she swore she had never taken or even heard of this drug. Plaintiff was told by the judge that if she tested positive a second time for this or any other drug, she would be immediately incarcerated for a period of one week. Plaintiff's graduation from defendant Beacon's program was also postponed and her mandatory treatment period was extended.

35. After the allegedly positive drug test for gabapentin for the urine sample taken on August 16, 2017, plaintiff specifically advised defendant Beacon's employee Carolyn Grisko that she had never ingested this drug and requested that all future urine samples be retained so that repeat testing could be performed in the event another sample is falsely reported as positive.  Ms. Grisko agreed that this would be done.

36. Knowing that she had never purposely ingested gabapentin, but being unable to convince the court of her innocence due to defendants' representations that the positive test was "confirmed", plaintiff continued to be tested two to three days per week and suffered from severe emotional distress and anxiety that another false positive test would be reported causing her to lose her freedom and forcing a conviction on her misdemeanor DWI charge.

37. On September 19, 2017, plaintiff submitted a urine test at defendant Beacon during one of her bi-weekly group counseling sessions.

38. The following day, September 20, 2017, plaintiff was required to submit to another urine test at one of her weekly individual counseling sessions.

39. Plaintiff's urine specimen taken on September 19, 2017 was sent by defendant Beacon to defendant Quest for analysis under Test Code 20776.

40. On September 28, 2017, the date that her rehabilitation program at defendant Beacon was scheduled to be completed and she was to graduate from defendant Beacon's rehabilitation program, plaintiff was informed that another urine sample taken from plaintiff on September 19, 2017 by defendant Beacon and sent to Quest for testing was reported as positive for an extremely small amount of gabapentin. Defendant Quest again reported that this test was confirmed by GCMS testing.

41. Plaintiff's urine sample taken on September 20, 2017 was reported as negative for all drugs tested.

42. Plaintiff requested that the September 19, 2017 sample be tested again, but despite her previous requests that all samples be retained, plaintiff was informed by representatives of defendant Beacon that her urine sample from September 19, 2017 had again been discarded by defendant Quest.

43. Upon information and belief, and based upon information conveyed to plaintiff's representatives by representatives of defendant Quest, the testing performed on all of plaintiff's urine samples sent to defendant Quest by defendant Beacon utilized an AB SCIEX QTRAP 5500 device.

44. Upon information and belief, the QTRAP device searches for the molecular weight of the precursor ions of the drugs in the screening panel in the first chamber of the machine, referred to as Q1. For gabapentin, the precursor ion the device searches for are those with a molecular weight 172. When ions of this molecular weight are identified, they are then sent to the second chamber referred to as Q3. Energy is then applied to the ions to cause them to fragment into subcomponents. For gabapentin, the molecular weights of the fragments created by breaking certain molecular bonds with energy are well known

because of the elements and groups that compose the precursor ion. This group of ions with their own specific molecular weights are referred to as the "library spectrum" for gabapentin.

45. To determine with a SCIEX QTRAP 5500 device whether an ion with a molecular weight of 172 found in the Q1 chamber is actually gabapentin as opposed to thousands of other compounds with molecular weight 172, energy is applied in the Q3 chamber fragmenting the 172 molecular weight ion into multiple fragments, which then produce the "acquired spectrum". This "acquired spectrum" is then compared to the "library spectrum" for gabapentin to determine whether the 172 molecular weight molecule was in fact gabapentin. This entire process happens in a single run of the urine sample and is a screening test methodology.

46. Defendant Quest at first refused to provide plaintiff with any documentation substantiating the test results, preventing her from having experts review the data and permitting them to explain the false positive test. Plaintiff had to choose whether to abandon her efforts to get proof she never took Gabapentin, or hire an attorney to defend her. Plaintiff engaged counsel who contacted defendant Quest on her behalf and demanded the documentation, citing applicable laws mandating the disclosure.

47. Defendant Quest eventually provided some of the required documentation. The provided documentation revealed that defendant Quest conducted a screen as opposed to a confirmed test, used different equipment than advertised, and – contrary to what was reported – the acquired spectrums from the Q3 chamber for both plaintiff's urine samples from August 16, 2017 and September 19, 2017 did not match the library spectrum for gabapentin.

48. The manufacturer of the device used by defendant Quest to analyze plaintiff's urine samples warns that false positives can occur and confirmation against the library spectrum is an absolute necessity for testing results to be considered reliable.

49. Because the acquired spectrum from the Q3 process for plaintiff's urine samples did not match the library spectrum for gabapentin, and specifically did not report any ions with molecular weights of 137, which, according to the manufacturer must be found if the substance is considered to be gabapentin, defendant Quest should never have reported either of plaintiff's urine samples as positive for gabapentin.

50. Defendant Quest only performed the single test run for each urine sample using the SCIEX QTRAP 5500which in one test screened for all of the selected drugs including gabapentin.

51. Defendant Quest did not perform a second confirmation test run on a SCIEX QTRAP 5500 or any other testing device of any of plaintiff's urine samples, specifically including the two that Defendant Quest reported as positive for gabapentin.

52. Defendant Quest billed plaintiff and her health insurer $135.20 for the initial screen run through the SCIEX QTRAP 5500.

53. Defendant Quest billed plaintiff and her health insurer an additional $43.10 for alleged confirmation testing of each of the ten drug classes in the panel even though each time plaintiff's urine was tested only once during a single run through the SCIEX QTRAP 5500.

54. Based upon the technology of the SCIEX QTRAP 5500, if no precursor ion is found in the Q1 chamber that matches the molecular weight of the substance being tested for, nothing further is or can be done, since no ion is sent to the Q3 chamber and no acquired spectrum is obtained to compare to a library spectrum for that substance.

55. Defendant Quest billed plaintiff and her insurance company $43.10 per test for confirmatory tests that were never performed on any samples.

56. After the second allegedly positive test, plaintiff was forced to leave the Drug Court program and retain criminal attorneys and experts to assist in establishing she had not abused gabapentin or any other drug and that these allegedly positive tests were inaccurate. She also paid for urine testing through another physician so she would have backup test results for any day she provided urine samples to defendant Beacon.

57. Plaintiff, through her representatives, made numerous requests to defendant Quest for documentation regarding plaintiff's urine testing to attempt to discern how these false positive tests had occurred, but defendant Quest's agents and employees intentionally and deliberately delayed, misrepresented facts and refused to produce documentation in a timely fashion hindering plaintiff's ability to establish her innocence.

58. Based upon the misrepresentations to the court by defendant Beacon, through its agents and employees, regarding the reliability of the allegedly positive urine tests and the deliberate actions of defendant Quest of withholding important information from plaintiff's representatives and experts and deliberately misrepresenting the nature of the testing, the Drug Court judge refused to consider the available scientific evidence submitted that the test results were inaccurate.

59. The Drug Court judge ordered that plaintiff could remain in the program if she spent a week in jail and then could restart the one-year program again, losing credit for the time she had successfully completed.  When confronted with these options, plaintiff's attorney representing her on the misdemeanor DWI charge was forced to withdraw her from the Drug Court program.  As a result, plaintiff now had to face sentencing for her DWI charge

before the same judge who believed she had lied on two separate occasions in open court about her gabapentin use.

60. While awaiting sentencing, plaintiff was required to meet with a probation officer whose report, based upon the two allegedly positive random drug tests for gabapentin and plaintiff's continued denials that she had ingested the drug, recommended she be required to restart the program and serve her sanction of one week of incarceration in the Erie County Holding Center.  Knowing this report would be presented to the judge as a recommendation, plaintiff suffered additional anxiety and emotional trauma.

61. When plaintiff presented for sentencing on January 23, 2018, her lawyer was informed by the judge in chambers that he was considering a sentence of 30 days in jail and three years of probation.  This information was conveyed to plaintiff causing additional anxiety and emotional trauma.

62. Plaintiff was then called in front of the Court and again publicly humiliated by the judge for her alleged abuse of gabapentin and failure to admit it.  The judge then permitted her to restart the Drug Court program, but required her from that point forward to pay for her own drug testing out of her pocket and if she tested positive again she would be immediately incarcerated for a minimum of one week.  She was also informed by the Court that she was not to make any further challenges to the validity of the positive urine test results as a condition to her avoiding incarceration.

63. Thereafter, until plaintiff graduated from the Beacon Center treatment program in early November, 2017 plaintiff was charged $566.20 by defendant Quest for each urine sample submitted which allegedly included charges for confirmation testing that was never done.

64. Plaintiff then re-entered the Drug Court Program in January of 2018 and, though her treatment had been completed, her drug testing continued to be conducted through defendant Beacon Center.   However, for the remaining nine months, plaintiff was required to continue being tested, defendant Beacon chose to send plaintiff's urine samples to a lab other than defendant Quest.  The new lab charged only thirty-five dollars per test, a small fraction of what defendant Quest charged.

65.   Plaintiff completed the remaining requirements of her extended treatment at defendant Beacon on November 3, 2017, more than a month after it would have been completed but for erroneous false positive urine tests.

66. Plaintiff completed the requirements of the Drug Court program on September 25, 2018 more than four months after she would have completed such requirements but for the erroneous false positive urine tests.

## CLAIM I

## COMMON LAW NEGLIGENCE AGAINST DEFENDANT BEACON

67. Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

68. Defendant Beacon owed a duty of reasonable care to plaintiff as a result of her enrollment in its rehabilitation program and to follow guidelines and procedures followed by reasonable rehabilitation programs and OASAS guidelines.

69. Specifically, defendant Beacon owed a duty of care to select a reasonable testing panel for her urine drug testing (UDT) for plaintiff's history of alcohol abuse and to carefully monitor the results.

70. In addition, for any positive test reported, defendant Beacon owed plaintiff a duty of care to review the results in the context of the complete clinical picture, because UDT results have a significant percentage of false positives.

71. Defendant Beacon, knew or should have known that the UDT pain management drug screen profile with confirmation selected was inappropriate based upon plaintiff's clinical history of alcohol abuse, but nevertheless continued to select this drug test panel each time she provided a urine sample.

72. Defendant Beacon repeatedly breached its duty of reasonable care to plaintiff by ordering the UDT pain management drug screen profile with confirmation each time plaintiff provided a urine sample

73. When plaintiff's August 16, 2017 urine test was reported by Quest as positive for gabapentin, defendant Beacon knew, or should have known, based upon the alleged amount detected, the negative UDT results from August 15, 2017 and August 17, 2017 and the published half-life and therapeutic dose levels for gabapentin, that the result was likely to be a false positive and unreliable result.

74. Defendant Beacon also knew or should have known, that defendant Quest was not conducting any confirmation testing of any of the UDT results.

75. In spite of all of the above, defendant Beacon breached its duty of reasonable care it owed to plaintiff by not discussing the results with plaintiff and interpreting the results in the context of the complete clinical picture.

76. Moreover, defendant Beacon breached its duty of reasonable care it owed to plaintiff when its employee, Carolyn Grisko, misrepresented to the Town of Clarence Drug Court

14

that plaintiff's allegedly positive UDT for gabapentin for her sample from August 16, 2017 was confirmed and reliable.

77. Defendant Beacon further breached its duty of reasonable care to plaintiff by failing to retain her urine sample from August 16, 2017 for retesting.

78.  When plaintiff's September 19, 2017 urine test was reported by Quest as positive for gabapentin, defendant Beacon knew, or should have known, based upon the alleged amount detected, the negative UDT results from September 20, 2017 and the published half-life and therapeutic dose levels for gabapentin, that the result was likely to be a false positive and unreliable result.

79. In spite of all of the above, defendant Beacon breached its duty of reasonable care it owed to plaintiff by not discussing the results of the allegedly positive September 19, 2017 UDT with plaintiff and interpreting the results in the context of the complete clinical picture.

80. Moreover, defendant Beacon breached its duty of reasonable care it owed to plaintiff when its employee, Carolyn Grisko, misrepresented to the Town of Clarence Drug Court that plaintiff's allegedly positive UDT for gabapentin for her sample from September 19, 2017 was confirmed and reliable.

81. Defendant Beacon further breached its duty of reasonable care to plaintiff by failing to retain her urine sample from September 19, 2017 for retesting, in spite of plaintiff's direct and specific request that defendant Beacon retain such sample.

82. As a result of the above breaches of the duty of reasonable care by defendant Beacon that it owed to plaintiff, plaintiff has suffered monetary damages, emotional pain and

suffering all to her detriment and in an amount in excess of the jurisdictional limits of all lower courts.

## CLAIM II

**COMMON LAW PROFESSIONAL NEGLIGENCE- MEDICAL MALPRACTICE AGAINST DEFENDANT WEBSTER**

83. Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

84. Defendant Webster, as defendant Beacon's medical director and the physician responsible for supervising plaintiff's rehabilitation program, owed a duty of reasonable care to follow guidelines and procedures followed by reasonable rehabilitation physicians and OASAS guidelines.

85. Specifically, defendant Webster owed a duty of care to select a reasonable testing panel for her urine drug testing (UDT) for plaintiff's history of alcohol abuse and to carefully monitor the results.

86. In addition, for any positive test reported, defendant Webster owed plaintiff a duty of care to review the results in the context of the complete clinical picture, because UDT results have a significant percentage of false positives.

87. Defendant Webster, knew or should have known that the UDT pain management drug screen profile with confirmation selected was inappropriate based upon plaintiff's clinical history of alcohol abuse, but nevertheless continued to select this drug test panel each time she provided a urine sample.

88. Defendant Webster repeatedly breached its duty of reasonable care to plaintiff by ordering the UDT pain management drug screen profile with confirmation each time plaintiff provided a urine sample

89. When plaintiff's August 16, 2017 urine test was reported by Quest as positive for gabapentin, defendant Webster knew, or should have known, based upon the alleged amount detected, the negative UDT results from August 15, 2017 and August 17, 2017 and the published half-life and therapeutic dose levels for gabapentin, that the result was likely to be a false positive and unreliable result.

90. Defendant Webster also knew or should have known, that defendant Quest was not conducting any confirmation testing of any of the UDT results.

91. In spite of all of the above, defendant Webster breached his duty of reasonable care owed to plaintiff and departed from the standard of care for a reasonably competent physician and the OASAS Guidelines by signing off on each of these UDT results without ever discussing the results with plaintiff and interpreting the results in the context of the complete clinical picture.

92. When plaintiff's September 19, 2017 urine test was reported by Quest as positive for gabapentin, defendant Webster knew, or should have known, based upon the alleged amount detected, the negative UDT results from September 20, 2017 and the published half-life and therapeutic dose levels for gabapentin, that the result was likely to be a false positive and unreliable result.

93. Defendant Webster again also knew or should have known, that defendant Quest was not conducting any confirmation testing of any of the UDT results.

94. In spite of all of the above, defendant Webster breached his duty of reasonable care he owed to plaintiff, departed from the standard of care for a reasonably prudent physician and violated OASAS Guidelines by signing off on this result without discussing the results of the allegedly positive September 19, 2017 UDT with plaintiff and interpreting the results in the context of the complete clinical picture.

95. As a result of the above breaches of the duty of reasonable care, departures from the standard of care and violations of OASAS Guidelines by defendant Webster, plaintiff has suffered monetary damages, emotional pain and suffering all to her detriment and in an amount in excess of the jurisdictional limits of all lower courts.

## CLAIM III

### COMMON LAW NEGLIGENCE AGAINST DEFENDANT QUEST

96. Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

97. Defendant Quest owed a duty of reasonable care in its UDT analysis of all of plaintiff's urine samples.

98. Defendant Quest represented to plaintiff and the public that it was conducting confirmation testing of all of her UDT results when, in fact, no such confirmation testing occurred.

99. Defendant Quest, through its employees and agents, failed to compare the acquired spectrum to the Acquired Spectrum to the Library Spectrum for gabapentin, or in the alternative, failed to use reasonable care in doing so.

100. When plaintiff's August 16, 2017 urine test was reported by defendant Quest as positive for gabapentin, defendant Quest knew, or should have known, based upon the

alleged amount detected, the negative UDT results from August 15, 2017 and August 17, 2017 and the published half-life and therapeutic dose levels for gabapentin, that the result was likely to be a false positive and unreliable result.

101.    Defendant Quest, through its employees and agents, failed to report to defendant Beacon and plaintiff that the allegedly positive August 16, 2017 test was very likely a false positive based upon information it new or should have known from the manufacturer of the SCIEX QTRAP 5500.

102.    Defendant Quest, through its employees and agents, breached its duty to plaintiff by reporting that her August 16, 2017 and September 19, 2017 UDT results were positive for gabapentin.

103.    Defendant Quest, through its employees and agents, breached its duty to plaintiff by reporting that her August 16, 2017 and September 19, 2017 UDT results were confirmed by second tests on her urine that were never conducted.

104.    Defendant Quest, through its employees and agents, further breached its duty to the plaintiff by delaying, misrepresenting and refusing to comply with plaintiff's representatives' lawful requests for documentation to help establish that these tests were false positives.

105.    Defendant Quest, through its employees and agents, further breached its duty of care to the plaintiff by failing to retain all test records and samples as it is required to do by law, further preventing plaintiff from establishing her innocence with regard to ingesting gabapentin.

106.    As a result of the above breaches of the duty of reasonable care owed to plaintiff by defendant Quest, plaintiff has suffered monetary damages, emotional pain and

suffering all to her detriment and in an amount in excess of the jurisdictional limits of all lower courts.

## CLAIM IV

### FRAUD AGAINST DEFENDANT QUEST AND
### VIOLATION OF N.Y. GEN. BUS. LAW § 349 *et seq.*

107.     Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

108.     Defendant Quest is required to adhere to the requirements of the New York General Business Law §349, *et seq.* (NYGBL) in connection with its acts and practices relating to laboratory testing.

109.     The NYGBL provides that "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state are hereby declared unlawful."

110.     Defendant Quest has pervasively violated the NYGBL, and continues to violate the NYGBL, by engaging in the deceptive, misleading, and unlawful acts and practices described in this Complaint.  Among other things, Defendant Quest violated the NYGBL by:

        a.     Billing plaintiff for confirmation testing under Test Code 20776 which was never performed;

        b.     Fraudulently representing that a single sample processed through a SCIEX QTRAP 5500 is actually multiple confirmatory tests;

        c.     Fraudulently representing and billing for confirmation testing for negative results when negative tests from the Q1 chamber in a SCIEX QTRAP 5500

are not subjected to any further analysis, and therefore, by definition cannot be "confirmed".

d.  Fraudulently representing to defendant Beacon, the drug court, plaintiff's insurance company and others that positive drug tests SCIEX QTRAP 5500 under Test Code 20776 were confirmed by GCMS testing by utilizing codes indicating such testing was performed;

e.  Failing to disclose that in fact, no confirmation testing was being performed and only screening testing was being conducted;

f.  Failing to disclose that the manufacturer of the equipment being used by defendant Quest to perform the testing advised against the reliability of positive test results under conditions where defendant Quest confirmed positive test results;

g.  Deceptively and unlawfully charging amounts in excess of the reasonable costs of the testing actually performed;

111.  Defendant engaged in these acts and practices for the purpose of deceiving Plaintiff and unjustly enriching itself.

112.  Defendant engaged in these deceptive, misleading, and unlawful acts and practices, to the detriment of Plaintiff.

113.  Defendant willfully engaged in such acts and practices, and knew that it violated the NYGBL or showed reckless disregard for whether it violated the NYGBL.

114.  The harm caused by these acts and practices vastly outweighs any legitimate utility they possibly could have.

115.    As a result of Defendant's violations of the NYGBL, Plaintiff has been injured and has suffered actual damages and monetary losses in the form of charges for GCMS confirmation drug testing that was not actually performed.

116.    Plaintiff is entitled to actual damages, treble damages, injunctive relief, attorneys' fees and costs and expenses, and any other remedies available under the NYDPA or in equity, for Defendants' violations of the NYDPA.  *See* N.Y. Gen. Bus. Law § 349(h).

**WHEREFORE** Plaintiff individually requests the Court to enter judgment against all Defendants on all Claims and award plaintiff compensatory, exemplary, and  consequential damages, including interest, in an amount to be proven at trial, in addition to costs and attorneys' fees as the court deems just and proper; and

Dated:  April 7, 2020
        Rochester, New York

FARACI LANGE, LLP

/s/ Stephen G. Schwarz
By: Stephen G. Schwarz, Esq.
sschwarz@faraci.com
Hadley L. Matarazzo, Esq.
hmatarazzo@faraci.com
28 E. Main Street, Suite 1100
Rochester, New York 14614
Telephone:  (585) 325-5150

## CERTIFICATE OF SERVICE

This is to certify that on April 7, 2020, I caused to be served via CM-ECF a copy of Plaintiff's First Amended Complaint on the following:

Peter J. Glennon, Esq. (PGlennon@GlennonLawFirm.com)

*Attorneys for Defendant, Quest Diagnostics of Pennsylvania Inc.*

Sharyn Rogers, Esq. (srogers@barclaydamon.com)

*Attorneys for Defendants, Buffalo Beacon Corporation (a/k/a "The Beacon Center") and Nathaniel C. Webster, M.D.*

/s/ Stephen G. Schwarz
Stephen G. Schwarz, Esq.